UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| LIGAYA L. JANKOWSKI, by <br> MICHAEL T. JANKOWSKI, under <br> POWER of ATTORNEY <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. _____ <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

Ligaya L. Jankowski ("Mrs. Jankowski"), by Michael T. Jankowski ("Mr. Jankowski") under Power of Attorney and by counsel, states as follows for her Complaint against Defendant United States of America:

### Jurisdiction and Venue

1. This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

2. Mr. Jankowski has authority to bring this action under a Power of Attorney as outlined in **Exhibit A**.

3. In compliance with 28 U.S.C. § 2675, Mrs. Jankowski filed a notice of administrative claim with the Department of Navy, attached as **Exhibit B**. That claim was received by the Office of the Judge Advocate General on April 23, 2020.

4. Plaintiff has attached the expert report of Charles J. Miller, M.D. as **Exhibit C**.

1

5. The Department of the Navy failed to make final disposition of this claim within six months after it was filed, therefore Plaintiff deems the claim to be denied. Accordingly, Mrs. Jankowski's causes of action are ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because the causes of action at issue in this case arose at the Naval Medical Center Portsmouth ("NMCP"), 620 John Paul Jones Circle, Portsmouth, VA 23708.

7. At all times relevant to this action, the United States owned and operated NMCP and its affiliated clinics.

8. At all times relevant to this action, the agents, servants, employees, and personnel of the United States were acting within the course and scope of their employment in providing and/or failing to provide medical care and treatment to Mrs. Jankowski.

9. The medical care described as follows was provided to Mrs. Jankowski at NMCP and/or its affiliated clinics unless otherwise stated.

## Allegations

10. Mrs. Jankowski re-states and re-alleges paragraphs 1 through 9 as if fully stated herein.

11. On July 10, 2019, Mrs. Jankowski presented to the emergency department ("ED") at NMCP in the company of her husband, Michael T. Jankowski, with complaints of shortness of breath and leg swelling.

12. On July 10, 2019, Mrs. Jankowski was admitted to NMCP and transferred to the progressive care floor.

13. Mrs. Jankowski began experiencing increased difficulty in breathing and continued bradycardia, and was transferred to the Intensive Care United ("ICU").

14. Once in the ICU and still on July 10, 2019, nurse Ashley M. Fuller noted Mrs. Jankowski's difficulty ambulating, nurse Pedro J. Davilaotero ("Mr. Davilaotero") and nurse Maria R. Capilitan ("Ms. Capilitan") documented that Mrs. Jankowski was dizzy, and nurse Joshua R. Spaulding ("Mr. Spaulding") completed a fall risk assessment on Mrs. Jankowski which resulted in a score of 16.

15. Per the John Hopkins Fall Assessment tool used, any score higher than 13 is considered a high fall risk; accordingly, the medical record indicates that Mrs. Jankowski was at high risk for a fall.

16. Additionally, per the National Quality Forum, serious injury from a fall while being cared for in a health care setting is considered a serious reportable event ("SRE"). SREs are commonly called "never events," and are considered preventable and serious.

17. Mr. Spaulding noted Mrs. Jankowski wore a wristband indicating she was a fall risk.

18. Nursing staff continued to complete fall risk assessments thereafter which consistently indicated that Mrs. Jankowski was a high fall risk.

19. On July 11, 2019, Mrs. Jankowski was out of the bed ambulating with physical therapy using a rolling walker.

20. After her physical therapy, Mrs. Jankowski was placed in her chair. The record indicates plans were in place for staff to perform hourly checks and to have a call bell within reach.

21. The record indicates that on July 11, 2019, at or around 2:41 p.m., nursing staff heard a thump and documented that Mrs. Jankowski had an unwitnessed fall.

22. The record does not indicate that a chair alarm had been activated prior to Mrs. Jankowski's fall, nor does it indicate that a chair alarm was sounding when she, having fallen, was discovered.

23. The record notes Mrs. Jankowski had bruising on her right cheek, for which she requested ice, and was rubbing the right side of her head.

24. Mrs. Jankowski underwent a CT scan of her head which showed no evidence of an intracranial hemorrhage at that time.

25. The record indicates that on July 11, at around 9:30 p.m., Mrs. Jankowski began experiencing nausea and emesis.

26. The record indicates that Mrs. Jankowski was then evaluated by Dr. Kara G. Lynch ("Dr. Lynch") and no changes to her care or treatment were recommended.

27. The record indicates that at around 1:30 a.m., approximately four hours later, Mrs. Jankowski began experiencing a headache and blurred vision in her left eye, as well as nausea.

28. A physician was informed but failed to come to Mrs. Jankowski's bedside.

29. The only modification to Mrs. Jankowski's treatment or care was that she was prescribed lorazepam for her nausea.

30. At approximately 3:00 a.m. that same night, Mrs. Jankowski was noted to have a decreased level of consciousness, arousing only to painful stimuli.

31. The record indicates that a physician was advised but does not indicate that the physician was requested to come to Mrs. Jankowski's bedside.

32. The record indicates that there were no new orders.

33. At about 3:30 a.m., Mrs. Jankowski became unresponsive, with a Glasgow Coma Scale of 3, and emesis which required suctioning.

34. The physician was once again notified, but no new orders were given.

35. At about 4:00 a.m., Dr. Franklin T. Duruobasa ("Dr. Duruobasa") and/or Dr. J. Jonas Carmichael ("Dr. Carmichael") finally came to Mrs. Jankowski's bedside and an emergent CT scan was ordered.

36. That CT demonstrated a large left subdural hematoma with a 1.7 cm rightward midline shift.

37. Mrs. Jankowski was returned to the ICU after the CT and was intubated.

38. The record indicates Mrs. Jankowski was to be kept hypocarbic and have mannitol administered to attempt to minimize the cerebral edema.

39. Neurosurgery was consulted and Mrs. Jankowski soon after underwent a left hemicraniectomy for decompression.

40. Mrs. Jankowski remained intubated post-operatively.

41. Approximately one week following her surgery, Mrs. Jankowski was given an electroencephalogram ("EEG") which showed diffuse cerebral slowing.

42. Due to this cerebral slowing, Mrs. Jankowski was never sufficiently awake to be extubated.

43. Therefore, on July 30, 2019, a tracheostomy tube was placed in her neck for continued assistance with breathing by ventilator and a percutaneous endoscopic gastronomy ("PEG") tube was placed in her abdomen for liquid nutrition.

44. It was also noted that Mrs. Jankowski had developed decubitus ulcers on her sacrum and right buttock.

45. On August 2, 2019, Mrs. Jankowski was transferred to a skilled nursing facility, Lake Taylor Hospital, where she continued to suffer from the sequelae of the cerebral edema and its treatment.

46. Mrs. Jankowski has remained in long-term skilled nursing facilities since that time, although she has required inpatient acute care at private hospitals for pneumonia and Syndrome of Trephined.

47. Mrs. Jankowski now suffers from chronic bedsores and, in October 2019, underwent a left autologous cranioplasty at NMCP.

48. Mrs. Jankowski has continued to be followed in the Neurosurgery Clinic at NMCP, and in that clinic on January 29, 2020, Mr. Jankowski was told that his wife would likely continue to need long-term, acute care and PEG tube feeding due to her severe traumatic brain injury.

49. Had healthcare providers at NMCP not failed to provide any fall prevention measures despite repeated observations that Mrs. Jankowski was a high fall risk, or in any other way prevented her fall, more likely than not she would not have suffered the cerebral hematoma caused by that fall. Furthermore, had healthcare providers at NMCP properly and timely provided bedside assessment on the night of Mrs. Jankowski's fall prior to her becoming unresponsive, more likely than not, her cerebral hematoma would have been discovered sooner and the severe disability due to the severity of her hematoma caused by her fall could have been prevented.

50. Mrs. Jankowski's injuries are a direct and proximate result of the negligent medical care provided by her healthcare providers at NMCP.

## Negligence

51. Mrs. Jankowski re-states and re-alleges paragraphs 1 through 50 as if fully stated herein.

52. As a provider of medical services to Mrs. Jankowski, the United States and its agents, servants, or employees at NMCP and its affiliates, including but not limited to Ms. Capilitan, Mr. Davilaotero. Mr. Spaulding, Dr. Lynch, Dr. Duruobasa, Dr. Carmichael, and any other nurses and doctors on duty surrounding the period of Mrs. Jankowski's fall and up to the discovery of her hematoma by CT, owed Mrs. Jankowski a duty to provide her medical care consistent with the governing standard of medical care.

53. The agents, servants, or employees of the United States at NMCP and its affiliates, including but not limited to Ms. Capilitan, Mr. Davilaotero, Mr. Spaulding, Dr. Lynch, Dr. Duruobasa, Dr. Carmichael, and any other nurses and doctors on duty surrounding the period of Mrs. Jankowski's fall and up to the discovery of her hematoma by CT, while acting within the scope of their employment, violated the applicable standards of medical care in the following respects:

    a. Negligent failure to implement any appropriate fall prevention measures, such as a chair alarm, prior to Mrs. Jankowski's fall;

    b. Negligent failure to provide one-to-one monitoring to prevent Mrs. Jankowski from suffering a fall;

    c. Negligent failure to prevent Mrs. Jankowski's fall;

    d. Negligent failure to monitor Mrs. Jankowski appropriately following the fall on the afternoon of July 11;

    e. Negligent failure to provide timely diagnostics, such as a brain CT, after there were changes in her physical assessment at 9:30 p.m. on the night after Mrs. Jankowski's fall;

f. Negligent failure to call physicians to the bedside when there were significant changes in her physical assessment at 1:30 a.m. on the night after Mrs. Jankowski's fall;

g. Negligent failure of physicians to come to Mrs. Jankowski's bedside when there were significant changes in her physical assessment at 1:30 a.m. on the night after Mrs. Jankowski's fall;

h. Negligent failure to provide timely diagnostics, such as a brain CT, after there were significant changes in her physical assessment at 1:30 a.m. on the night after Mrs. Jankowski's fall;

i. Negligent failure to call physicians to the bedside when there were significant changes in her physical assessment at 3:00 a.m. on the night after Mrs. Jankowski's fall;

j. Negligent failure of physicians to come to Mrs. Jankowski's bedside when there were significant changes in her physical assessment at 3:00 a.m. on the night after Mrs. Jankowski's fall;

k. Negligent failure to provide timely diagnostics, such as a brain CT, after there were significant changes in her physical assessment at 3:00 a.m. on the night after Mrs. Jankowski's fall;

l. Negligent failure to call physicians to the bedside when there were significant changes in her physical assessment at 3:30 a.m. on the night after Mrs. Jankowski's fall;

  m. Negligent failure of physicians to come to Mrs. Jankowski's bedside when there were significant changes in her physical assessment at 3:30 a.m. on the night after Mrs. Jankowski's fall;

  n. Negligent failure to provide timely diagnostics, such as a brain CT, after there were significant changes in her physical assessment at 3:30 a.m. on the night after Mrs. Jankowski's fall;

  o. Negligent failure to timely diagnose Mrs. Jankowski's cerebral hematoma;

  p. Negligent failure to prevent the development of Mrs. Jankowski's decubitus ulcers; and

  q. Any and all other deviations from the standard of care which will be developed through further investigation, discovery, and expert review.

54. As a direct and proximate result of the aforementioned negligence of Defendant, Mrs. Jankowski claims the following damages:

  a. Compensation for pain, suffering, inconvenience, traumatic brain injury, bodily injury, permanent disability, and emotional distress;

  b. Compensation for all economic damages, including medical expenses, incidental expenses, and lost earnings and lost and impaired earning capacity; and

  c. Compensation for any other damages sustained by Mrs. Jankowski as a proximate result of the negligence of the government's employees and/or agents.

WHEREFORE, Plaintiff requests that the Court grant judgment in her favor against the Defendant in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00), together with any other costs as they may be lawfully entitled to recover.

                Respectfully submitted,

                            LIGAYA L. JANKOWSKI, by
                            MICHAEL T. JANKOWSKI under
                            POWER OF ATTORNEY

By: _____
                            Brewster S. Rawls
                            David A. Tierney
                            Rawls Law Group, P.C.
                            211 Rocketts Way, Suite 100
                            Richmond, VA 23231
                            (804) 344-0038
                            (804) 782-0133 – Facsimile
                            brawls@rawlslawgroup.com
                            dtierney@rawlslawgroup.com